UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KARLENA DAWSON, et al.,<br><br>Petitioner-Plaintiffs,<br><br>v.<br><br>NATHALIE ASHER, et al.,<br><br>Respondent-Defendants. | CASE NO. C20-0409JLR-MAT<br><br>ORDER DENYING PETITIONERS' SECOND MOTION FOR A TEMPORARY RESTRAINING ORDER |

## I.     INTRODUCTION

Before the court are (1) Petitioner-Plaintiffs Karlena Dawson, Norma Lopez Nunez, Marjoris Ramirez-Ochoa, Maria Gonzalez-Mendoza, Joe Hlupheka Bayana, Kelvin Melgar-Alas, Jesus Gonzalez Herrera, Alfredo Espinoza-Esparza, and Leonidas Plutin Hernandez's (collectively, "Petitioners") second motion for a temporary restraining order ("TRO") (2d TRO Mot. (Dkt. # 36)) and (2) Petitioners' response to the court's order to show cause regarding standing (Pet. OSC Resp. (Dkt. # 46); *see also* OSC (Dkt. # 34)).

Respondent-Defendants Nathalie Asher, Matthew T. Albence, Steven Langford, and United States Immigration and Customs Enforcement's ("ICE") (collectively, "Respondents"[1]) oppose Petitioners' second TRO motion (2d TRO Resp. (Dkt. # 64)) and filed a reply regarding the issue of Petitioners' Article III standing (Res. OSC Resp. (Dkt. # 63)). The court has reviewed Petitioners' motion and the parties' submissions related to that motion and the court's order to show cause, the relevant portions of the record, and the applicable law. Being fully advised,[2] the court (1) concludes that Petitioners have Article III standing; (2) concludes that the court has jurisdiction to adjudicate Petitioners' Fifth Amendment claim under the habeas statute, 28 U.S.C. § 2241; and (3) DENIES Petitioners' second motion for a TRO.

## II.     BACKGROUND

### A.     Procedural Background

On March 16, 2020, Petitioners filed their petition-complaint, seeking a writ of habeas corpus, or in the alternative, injunctive relief, against Respondents. (*See* Pet. at 20.) Petitioners represent that they are "particularly vulnerable to serious illness or death if infected by COVID-19" due to their age and/or medical conditions. (*See id.* ¶¶ 39-66.)

//

//

---

[1] Petitioners' filing is a "petition for writ of habeas corpus . . . and complaint for injunctive relief." (*See* Pet. (Dkt. # 1) at 1.) Because the court concludes that it has jurisdiction to review Plaintiffs' Fifth Amendment claim under 28 U.S.C. § 2241, *see infra* § III.D, the court now refers to petitioner-plaintiffs as "Petitioners" and respondent-defendants as "Respondents."

[2] Neither party requests oral argument (*see* 2d TRO Mot. at 1; 2d TRO Resp. at 1), and the court finds oral argument unnecessary to its disposition of the motion, *see* Local Rules LCR 7(b)(4); LCR 65(b)(3).

On the same day, Petitioners filed their first TRO motion seeking "immediate release" from detention as they awaited adjudication of their immigration cases. (*See* 1st TRO Mot. (Dkt. # 2) at 7.) Petitioners argued that "[t]he conditions of immigration detention facilities pose a heightened public health risk for the spread of COVID-19" because of "crowding, the proportion of vulnerable people detained, and often scant medical care resources," in addition to the inability to achieve the social distancing needed to effectively prevent the spread of COVID-19. (*See id.*) Petitioners contended that their continued detention in the face of the COVID-19 pandemic violated their Fifth Amendment right to reasonable safety while in custody. (*See id.* at 12.) Respondents opposed the motion and argued that Petitioners' lack Article III standing and that the court lacked jurisdiction to hear Petitioners' claim in the form of a habeas petition. (*See* 1st TRO Resp. (Dkt. # 28) at 7-11.)

On March 19, 2020, the court denied Petitioners' first TRO motion because Petitioners had not shown a likelihood of success on the merits or a likelihood of irreparable harm. (*See* 3/19/20 Order (Dkt. # 33) at 4-6.) The following day, the court ordered Petitioners to respond to Respondents' arguments regarding Article III standing. (*See* OSC at 2.) On the same day, Petitioners requested a status conference and sought expedited discovery from Respondents. (*See* Discovery Request (Dkt. # 35).)

On March 24, 2020, Petitioners filed their second TRO motion, and on March 25, 2020, they filed their response to the court's order to show cause. (*See* 2d TRO Mot.; *see* Pet. OSC Resp.) Petitioners' second TRO motion is premised on the following developments: (1) the Ninth Circuit Court of Appeals' March 23, 2020, *sua sponte* order

releasing an individual from immigration detention "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers" (*see* 2d TRO Mot. at 2 (quoting *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020)));[3] (2) other federal court orders releasing individuals "on bail or delay[ing] their imprisonment in light of the COVID-19 crisis" (*see id.* at 2); (3) a letter from "two doctors who serve as subject matter experts for the Department of Homeland Security" warning of "tinderbox" conditions at detention centers (*see id.* at 2-3 (citing Ngo Decl. (Dkt. # 37) ¶ 4, Ex. A ("Allen-Rich Ltr.") at 4); and (4) the fact that individuals have tested positive for COVID-19 "at other immigration detention facilities in the United States" (*see id.* at 3).

After filing their second TRO motion, Petitioners filed notices of supplemental authority informing this court of several orders in other districts granting TROs on the basis of conditions at detention facilities that increase the risk of contracting COVID-19. (*See* 1st Pet. Not. of Supp. Auth. (Dkt. # 56) ¶ 1 (citing *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020)); ¶ 2 (citing *Coronel v. Decker*, --- F. Supp. 3d ---, 2020 WL 1487274, at *10 (S.D.N.Y. Mar. 27, 2020)); 2d Pet. Not. of Supp. Auth. (Dkt. # 61) at 1 (citing *Castillo et al. v. Barr et al.*, --- F. Supp. 3d ----, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020)); 3d Pet. Not. of Supp. Auth. (Dkt. # 71) at 1

//

---

[3] The Ninth Circuit's order was initially marked for publication, but subsequently the Ninth Circuit entered an order stating that the "for publication" designation was a clerical error and removed it. *Xochihua-Jaimes*, No. 18-71460, Dkt. # 54 (9th Cir. Mar. 24, 2020). Moreover, the order does not set forth its analysis in a manner that allows this court to apply it to Petitioners' case.

(citing *Thakker et al. v. Doll et al.*, No. 1:20-CV-480, 2020 WL 1671563, at *1 (M.D. Pa. Mar. 31, 2020)).)  Respondents also filed a notice of supplemental authority, citing cases in which courts in this district denied motions for TROs to release immigration detainees on Fifth Amendment grounds.  (*See* Resp. Not. of Supp. Auth. (Dkt. # 85) at 1-2 (citing *Almeida v. Barr*, No. C20-490RSM-BAT, Dkt. # 11 (W.D. Wash. Apr. 6, 2020); *Patel v. Barr*, C20-488RSM-BAT, Dkt. # 9 (W.D. Wash. Apr. 2, 2020)).)

On March 31, 2020, in a separate but related development, the Ninth Circuit transferred to this district several emergency motions for release from the Tacoma Northwest Detention Center ("NWDC") due to the COVID-19 pandemic and construed the motions as petitions for habeas corpus under 28 U.S.C. § 2241.  *See, e.g.*, *Almeida*, No. C20-490RSM-BAT, Almeida Transfer Order (Dkt. # 1-1) at 2 (W.D. Wash. Mar. 31, 2020); *Patel*, No. C20-0488RSM-BAT, Patel Transfer Order (Dkt. # 1-1) at 2 (W.D. Wash. Mar. 31, 2020); *Pablo v. Barr*, No. C20-489RSM-BAT, Pablo Transfer Order (Dkt. # 1-1) at 2 (W.D. Wash. Mar. 31, 2020).[4]

**B.  Petitioners and Their Detention Status**

Petitioners are five individuals who ICE is currently holding in civil detention at the NWDC in Tacoma, Washington and four who ICE has released.[5]  (*See* Pet. ¶¶ 39-66.)

---

[4] The petitioner in *Pablo* voluntarily dismissed his case on April 3, 2020.  *See Pablo*, No. C20-489RSM-BAT, Not of Vol. Dismissal (Dkt. # 10) at 1 (W.D. Wash. Apr. 3, 2020).

[5] On March 27, 2020, Petitioners notified the court that Mr. Espinoza-Esparza and Mr. Hernandez were released from detention.  (*See* 1st Not. of Release (Dkt. # 57) at 1.)  On March 30, 2020, Respondents notified the court that ICE has released Ms. Dawson from immigration custody on an order of supervised release.  (*See* 2d Not. of Release (Dkt. # 70) at 1.)  On April 7, 2020, Respondents notified the court that ICE has released Ms. Gonzalez-Mendoza.  (*See* 3d Not. of Release (Dkt. # 88) at 1.)

Ms. Ramirez-Ochoa is 43 years old and a citizen of Cuba who suffers from high blood pressure, chronic kidney disease, epilepsy, and respiratory problems. (*See* Ramirez-Ochoa Decl. (Dkt. # 9) ¶¶ 1-2, 5-7, 9.) Ms. Ramirez-Ochoa has several convictions for shoplifting, petit theft, and a 2016 conviction for theft in the third degree. (*See* 1st Bostock Decl. (Dkt. # 66) ¶ 36.) On April 3, 2019, Ms. Ramirez-Ochoa was convicted of felony robbery in the second degree, an offense that involved the use of a firearm. (*See id.*) She was sentenced to six months and placed into ICE custody on April 4, 2019. (*See id.*) On March 5, 2020, an immigration judge ordered Ms. Ramirez-Ochoa removed to Cuba. (*See id.*)

Mr. Bayana is 57 years old and a citizen of Zimbabwe who has type II diabetes and takes medication for seizures. (1st Bayana Decl. (Dkt. # 13) ¶¶ 1, 3-4.) Respondents believe his real name is Mketwa Phiri and that Joe Hlupheka Bayana is a false name that Mr. Bayana has used on a fraudulently obtained South African passport, which Mr. Bayana presented to an immigration judge to obtain bond on May 16, 2002. (*See* 1st Bostock Decl. ¶ 38.) After accepting an order of voluntary departure to South Africa, Mr. Bayana failed to depart voluntarily and subsequently failed to report for removal twice. (*See id.*) Mr. Bayana has been arrested approximately 22 times for charges that include trespassing, larceny, drugs, assault, and harassing communications. (*See id.*) Mr. Bayana was an immigration fugitive from August 30, 2012, until April 5, 2018. (*See id.*) After applying for work authorization, ICE took Mr. Bayana into custody on October 17, 2018. (*See id.*) The South African government subsequently notified ICE and provided

//

documentation confirming that the real Joe Hlupheka Bayana was deceased, establishing that Joe Hlupheka Bayana is not Mr. Bayana's real name. (*See id.*)

Mr. Melgar-Alas is 40 years old and a citizen of El Salvador who has been in a wheelchair since a September 27, 2015, shooting that resulted in a spinal cord injury. (*See* Melgar-Alas Decl. (Dkt. # 15) ¶¶ 1, 4.) Mr. Melgar-Alas has a colonoscopy bag and "has to catheterized (sic) up to five times each day." (*Id.* ¶ 6.) Since first being detained at the NWDC in July 2018, he has been hospitalized five times, "including multiple times for probable pneumonia." (*Id.* ¶ 7.) Mr. Melgar-Alas has convictions for distribution of methamphetamine and was convicted in 2013 of a RICO offense for his membership and participation in the Mara Salvatrutcha gang, also known as MS-13. (*See* 1st Bostock Decl. ¶ 40.) He was sentenced to 27 months in prison and released to ICE on July 18, 2018. (*See id.*) On February 6, 2020, an immigration judge denied Mr. Melgar-Alas bond, finding him to be both a danger and a flight risk. (*See id.*)

Mr. Herrera is 46 years old and suffers from diabetes and high blood pressure. (*See* Herrera Decl. (Dkt. # 16) ¶¶ 1, 5.) He came into ICE custody following a conviction on July 22, 2019, for burglary. (*See* 1st Bostock Decl. ¶ 41.)

Ms. Lopez Nunez is a 65 year old citizen of Mexico who suffers from hypertension, heart disease, and mental health issues. (*See* Maltese Decl. (Dkt. # 8) ¶ 9, Ex. C.) She has multiple prior removals and approximately five prior convictions for illegal re-entry. (*See* 1st Bostock Decl. ¶ 35.) Ms. Lopez Nunez was transferred to the NWDC on April 28, 2017. She has been denied bond multiple times after being found to be a flight risk. (*See id.*)

## C.     Conditions at the NWDC

The parties rely on a series of declarations in support of and in opposition to Petitioners' second motion for a TRO.  Petitioners rely primarily on (1) the individual declarations of Petitioners and other current and former NWDC detainees[6] (*see* Ramirez-Ochoa Decl.; Gonzalez-Mendoza Decl. (Dkt. # 11); Bayana Decl.; Melgar-Alas Decl.; Herrera Decl.; Maltese Decl.; Dawson Decl. (Dkt. # 78); Espinoza-Esparza Decl. (Dkt. # 79); Lopez Gonzalez Decl. (Dkt. # 80); Hernandez Decl. (Dkt. # 82); Lopez Nunez Decl. (Dkt. # 81)), and (2) declarations from a series of subject matter experts who opine on the COVID-19 pandemic and the conditions at detention centers generally (*see, e.g.*, Allen-Rich Ltr.; Rekart Decl. (Dkt. # 41); Gonza Decl. (Dkt. # 42)).  Respondents rely primarily on the declarations declarations of (1) Drew H. Bostock, the Officer in Charge ("OIC") with DHS, ICE, Enforcement and Removal Operations ("ERO") in the Seattle Field Office ("ERO Seattle") (1st Bostock Decl.; 2d Bostock Decl. (Dkt. # 76); 3d Bostock Decl. (Dkt. # 84)), (2) NWDC Facility Administrator Stephen Langford (1st Langford Decl. (Dkt. # 68); 2d Langford Decl. (Dkt. # 74)), and (3) Clinical Director for the ICE Health Services Corps ("IHSC") Sheri Malakhova (1st Malakhova Decl. (Dkt. # 75); 2d Malakhova Decl. (Dkt. # 86)).

The NWDC is a private detention center run by The GEO Group, Inc. ("GEO"). (1st Bostock Decl. ¶ 4.)  It has the capacity to house 1,575 detainees and historically

---

[6] On April 1, 2020, the court ordered Respondents to file additional evidence regarding the conditions at the NWDC and the measures Respondents are taking to prevent the spread of COVID-19 and allowed Petitioners to file additional evidence if they wished to do so.  (*See* 4/1/2020 Order (Dkt. # 73) at 2-5.)

operates near capacity. (*Id.* ¶ 6.) However, as of April 3, 2020, the NWDC has only 794 detainees, which represents only 50.4% of its typical number of detainees. (2d Bostock Decl. ¶ 29.) Between March 1, 2020, and April 2, 2020, 407 detainees arrived at the NWDC and 399 detainees departed. (*Id.* ¶ 27.) One hundred and thirty-eight of the detainees who arrived at the NWDC during that span arrived on March 1, 2020, and most of those detainees were transferred from the southern border. (*Id.* ¶ 27 n.3.) However, ICE last transferred detainees from the southern border to the NWDC on March 5, 2020, and does not anticipate any additional transfers from that area in the reasonably foreseeable future. (1st Bostock Decl. ¶ 7.)

On March 18, 2020, ICE announced that due to the ongoing COVID-19 pandemic, it would adjust enforcement to focus on public safety risks and individuals subject to mandatory detention based on criminal grounds. (*Id.* ¶ 8.) For individuals who do not fall within these categories, ICE is currently exercising its discretion to delay enforcement actions until after the COVID-19 crisis or to use alternatives to detention, where appropriate. (*Id.*) Due to this change, ICE expects only a limited number of incoming detainees at the NWDC during the COVID-19 crisis—the majority of whom will be aliens who represent public safety risks and are subject to mandatory custody provisions. (*Id.* ¶ 9.)

As a response to the COVID-19 crisis, IHSC, which oversees medical care at the NWDC, implemented certain safety protocols. (*Id.* ¶ 11.) On March 26, 2020, IHSC implemented temperature and prescreening checks for all new detainees arriving at the NWDC prior to entrance into the facility. (*Id.*; 1st Malakohva Decl. ¶¶ 2-28.) Regular

procedures at the NWDC require that all incoming detainees' personal property and valuable are inventoried and stored. (1st Bostock Decl. ¶ 12.) Further, all incoming detainees are afforded the opportunity to shower and given clean clothing, bedding, towels, and personal hygiene items. (*Id*.) OIC Bostock testifies that GEO provides all detainees with an instructional flyer outlining proper hand washing hygiene and the importance of covering coughs, and that in response to the COVID-19 pandemic, additional posters in multiple languages concerning hand washing hygiene and covering coughs have been placed in each housing unit at the NWDC. (*Id.* ¶ 13.)

As of March 20, 2020, all incoming detainees who do not meet current IHSC protocol requirements for isolation monitoring due to possible COVID-19 symptoms, exposure, or testing, are placed in three separate housing units for 14 days of monitoring for signs or symptoms of COVID-19. (*Id.* ¶ 14; 2d Bostock Decl. ¶ 23.) Detainees in the 14-day observation period are not allowed to commingle with other detainees in common areas during the 14-day period. (1st Bostock Decl. ¶ 14.) Detainees admitted on the same date and who are determined to be at the same risk classification may be housed in the same cell for the 14-day observation period. (*Id*.) Detainees admitted on separate dates and those at different risk classification levels are not housed together. (*Id*.) If the 14-day period passes without any detainees in a cell displaying signs or symptoms of COVID-19, the detainees are released to other housing units in the facility. (*Id*.) A separate remote medical unit has been established to monitor detainees undergoing the 14-day observation. (*Id*.)

//

In response to the COVID-19 pandemic, OIC Bostock testifies that GEO has enhanced its cleaning in all units, food preparation and service areas, intake rooms and other work centers with increased emphasis on cleaning contact areas with disinfectant cleaners approved as effective against COVID-19. (*Id.* ¶ 16.) GEO makes soap and cleaning supplies available to detainees in all housing units and work areas at the NWDC and has increased the amount of soap, disinfectant cleaner, and food service sanitizer in every housing unit in response to COVID-19. (*Id.* ¶ 17.) GEO also holds weekly town hall meetings with detainees in every housing unit to educate detainees on hand washing and covering coughs. (*Id.* ¶ 18.) Nevertheless, some current and former detainees declare that they did not receive adequate information on prevention techniques. (*See, e.g.*, Dawson Decl. ¶ 6; Nunez Lopez Decl. ¶ 14.) GEO instructs detainees to clean tables and horizontal surfaces before each meal and to disinfect such surfaces after each meal. (1st Bostock Decl. ¶ 18.) GEO also instructs detainees to clean countertops, microwave handles, door handles, exercise equipment, electronic tablets, telephones, and any high-risk contact areas with disinfectant cleaner. (*Id.*)

On March 13, 2020, ICE temporarily suspended social visitation at the NWDC, and other detention facilities, to prevent the spread of COVID-19, and cancelled all tours of the NWDC. (*Id.* ¶¶ 19-20.) GEO screens all contractors, vendors, attorneys, and court visitors through a questionnaire that covers whether the individual is currently experiencing any possible COVID-19 symptoms and recent travel history and prohibits entry to anyone who positively reports symptoms or possible exposure to COVID-19. (*Id.* ¶ 21.) Visitors are limited to noncontact visits unless a contact visit is absolutely

necessary and has been approved by the OIC or Assistant OIC. (*Id.* ¶ 22.) If an

attorney's request for a contact visit is approved, the attorney must wear personal

protective equipment ("PPE"), including a mask. (*Id.*) In addition, ICE has implemented

a daily duty officer to facilitate unmonitored attorney-client phone calls from each

housing unit so that detainees do not have to move throughout the facility. (*Id.*)

ICE and GEO are collaborating on a process to implement temperature checks of

all employees and staff for GEO, ICE, and Executive Office for Immigration Review

("EOIR") at the NWDC starting on March 27, 2020. (*Id.* ¶ 24.) ICE and GEO

employees are instructed to stay home if they are sick, experiencing any possible

COVID-19 symptoms, or have been in close contact with someone diagnosed with

COVID-19. (*Id.* ¶ 25.) GEO is voluntarily notifying ICE if any of its employees test

positive or are diagnosed with COVID-19. (*Id.*) As of March 27, 2020, no ICE or GEO

employee or staff at the NWDC had reported testing positive for COVID-19.[7] (*Id.*) In

addition, ICE instituted a telework program for its employees at the NWDC to minimize

the number of employees present at the facility. (*Id.* ¶ 26.)

 In response to the court's order to file additional evidence, the parties filed

contrasting evidence regarding detainees' ability to engage in physical distancing. Mr.

Langford declares that detainees at the NWDC have the ability to maintain at least six

feet of physical distance from each other, that there is 2,848 square feet of day room

---

[7] Because the presence of an active COVID-19 case at the NWDC would be a significant development, the court ORDERS Respondents to inform Petitioners and the court as soon as practicable but at least within 24 hours after learning that any individual physically present at the NWDC tests positive for or is otherwise diagnosed with COVID-19.

space in Unit A-2, which when divided by 80 detainees, represents 35.6 square feet per detainee. (2d Langford Decl. ¶ 6.) However, several current and former detainees declare that it was difficult to maintain physical distance at the medical clinic (*see, e.g.*, Dawson Decl. ¶ 4; Espinoza-Esparza Decl. ¶ 4;), when eating (*see, e.g.*, Dawson Decl. ¶ 5; Espinoza-Esparza Decl. ¶ 5; Gonzalez Decl. ¶ 4), and while waiting to use the restroom (*see* Espinoza-Esparza Decl. ¶ 6). A detainee and attorney declare that maintaining physical distance is not possible while at immigration court. (Gonzalez Decl. ¶ 5 (declaring that detainees are "bunched together" in a holding room and in the hall prior to entering the courtroom); Augustine Decl. (Dkt. # 83) ¶¶ 3-5 (describing crowded conditions while waiting to enter the courtroom).)

When at maximum capacity, NWDC detainees would normally sleep less than six feet apart. (2d Langford Decl. ¶ 7.) However, NWDC has been operating at roughly half-capacity, and GEO has spread out the sleeping arrangements to allow for greater distance between detainees. (*Id.*) Dividing the available sleeping space by the present detainee population yields 31 square feet of sleeping space per detainee. (*Id.* ¶ 8.) When detainees are assigned to sleep in a bunk bed, there is only four feet of space between the top bunk and lower bunk. (*Id.* ¶ 14.) However, there is a metal and mattress barrier dividing that space. (*Id.*) Nevertheless, Ms. Dawson, who left the NWDC on March 30, 2020, declares that the beds were about a foot apart. (Dawson Decl. ¶ 3.) Mr. Espinoza-Esparza declares that detainees' beds were inches apart. (Espinoza-Esparza Decl. ¶ 3.) Mr. Langford declares that situations exist in which detainees may choose to be within six feet of each other, including meal preparation for those who volunteer, or

participatation in the voluntary work program ("VWP"), which is not required.  (2d Langford Decl. ¶ 14.)

Director Malakhova declares that the medical clinic and the Medical Housing Unit ("MHU"), including the line where medications are dispersed, has posted signs and color footprints placed on the floor to assist detainees in maintaining physical distance.  (1st Malakhova Decl. ¶ 2.)[8]  To increase social distancing, MHU rooms at the NWDC are limited to single patient occupancy.  (*Id.* ¶ 3.)  Detainees may come within six feet of IHSC staff within the medical clinic and MHU.  (*Id.* ¶ 4.)  To mitigate the risk of contracting COVID-19, MHU, IHSC, and GEO have implemented measures that include temperature check screening all IHSC employees upon entry, implementing a universal mask policy for IHSC staff on April 1, 2020, requiring GEO staff in the medical clinic to wear surgical masks at all times, stocking N95 respirator masks for use by medical staff for individuals with COVID-19 presumptive symptoms, and cancelling outside elective medical appointments.  (*Id.* ¶¶ 4-5.)  Director Malakhova declares that IHSC has the necessary resources to execute all of its COVID-19 response plans.  (*Id.* ¶ 23.)

Notwithstanding the above measures, current and former detainees complain of a number of other conditions at the NWDC.  Those include using the same water fountain that is not cleaned between uses (Dawson Decl. ¶ 8); using the same toilets, showers, sink, and microwaves (*id.* ¶ 8); inadequate cleaning of food trays (*id.*); having to request

//

---

[8] One released Petitioner, Ms. Dawson, declares that "[t]hey did not put any marks on the ground so we could tell how far apart six feet is."  (Dawson Decl. ¶ 7.)  However, it is unclear to which area of the NWDC Ms. Dawson refers.

access to the janitor's closet to obtain the cleaning solution for those on cleaning duty (*id.* ¶ 9); provision of a sanitizing spray instead of hand sanitizer (Espinoza-Esparza Decl. ¶ 6); and being forced to buy soap for showers (Gonzalez Decl. ¶ 10).

In late March 2020, ERO Tacoma began conducting a discretionary review of certain detainees who meet the current CDC criteria as at-risk due to COVID-19. (1st Bostock Decl. ¶ 31.) The review requires that IHSC and ICE identify detainees who fall within an at-risk category and who are not subject to various mandatory custody provisions based on their immigration and criminal histories. (*Id.*) If an identified detainee is not subject to mandatory custody, ERO Tacoma determines whether the detainee is otherwise a danger to the public and/or a flight risk such that release is not appropriate. (*Id.*) ICE is currently conducting this review on an individualized basis to determine in the totality of the circumstances whether each detainee is a danger to the community or a significant flight risk such that release is not appropriate. (2d Bostock Decl. ¶ 39.) As a result of this labor-intensive review, by March 27, 2020, ICE had already released seven detainees from custody, including four Petitioners in this case. (*See* 1st Bostock Decl. ¶¶ 31-32; *see also* 1st Not. of Release at 1; 2d Not. of Release at 2; 3d Not. of Release at 3.) Among the five Petitioners still detained at the NWDC, Ms. Lopez Nunez, Ms. Ramirez Ochoa, Mr. Melgar-Alas, and Mr. Bayana are subject to mandatory custody. (3d Bostock Decl. ¶ 12.) Mr. Herrera's custody is currently subject to ICE's review process described above. (*Id.*)

Finally, ICE has been regularly assessing current conditions and future projections regarding the course of the virus, regularly updating prevention and control protocols,

and working with IHSC, GEO, and EOIR staff to ensure appropriate procedures are implemented at the NWDC in compliance with CDC recommendations.  (2d Bostock Decl. ¶ 30.)

### III.    ANALYSIS

Petitioners contend that their continued detention in the face of the COVID-19 pandemic violates their Fifth Amendment right to reasonable safety while in custody. (*See* 2d TRO Mot. at 12.)  Respondents disagree, and further oppose Petitioners' motion on the grounds that Petitioners lack Article III standing and the court lacks jurisdiction to hear this case as a habeas petition under 28 U.S.C. § 2241.  (*See generally* 1st TRO Resp.; 2d TRO Resp.; Res. OSC Resp.)  For the reasons set forth below, the court (1) concludes that Petitioners have Article III standing, (2) concludes that the court has jurisdiction to adjudicate Petitioners' Fifth Amendment claims under the habeas statute, 28 U.S.C. § 2241, and (3) DENIES Petitioners' second motion for a TRO.

### A.    Article III Standing

Respondents contend that Petitioners lack Article III standing.  (*See* 1st TRO Resp. at 7-11; Res. OSC Resp. at 1-9.)  Standing has three elements:  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).  The plaintiff bears the burden of establishing these elements, and when "a case is at the pleading stage, the plaintiff must

'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  The standing inquiry is distinct from the merits of Petitioners' claims.  *See, e.g.*, *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (stating that the court's "threshold inquiry into standing 'in no way depends on the merits'" of the plaintiff's claim).

"To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc.*, 528 U.S. at 181, (quoting *Lujan*, 504 U.S. at 560); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Petitioners must show that the injury is "certainly impending" or "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus***,** 573 U.S. 149, 158 (2014) (internal quotation marks omitted).  "A future injury need not be 'literally certain,' but there must be a 'substantial risk' that it will occur." *Nw. Requirements Utils. v. F.E.R.C.*, 798 F.3d 796, 805 (9th Cir. 2015) (quoting *Clapper*, 568 U.S. at 432).  "[T]he question becomes whether any perceived threat . . . is sufficiently real and immediate to show an existing controversy." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).  Nevertheless, unsafe conditions in a prison or detention center in and of themselves constitute a concrete injury, even if further resulting harm has not yet occurred.  *See, e.g.*, *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (holding that prisoners "have the right not to be subjected to the unreasonable threat of injury or death by fire and need not wait until actual casualties occur in order to obtain relief from such conditions."); *id.* ("Failure to provide adequate cell cleaning supplies, under

circumstances such as these, deprives inmates of tools necessary to maintain minimally sanitary cells, seriously threatens their health, and amounts to a violation of the Eighth Amendment.").

The court concludes Petitioners have Article III standing. Five Petitioners are currently detained at the NWDC. (*See* Pet. ¶ 39.) Petitioners allege that in the face of the COVID-19 pandemic, "social distancing and hygiene measures are Petitioners' only defense against COVID-19." (*See id.* ¶ 82.) Petitioners further allege that their current detention conditions make it "exceedingly difficult, if not impossible" to exercise distancing and hygiene measures because Petitioners "share toilets, sinks, and showers, eat in communal spaces, and are in close contact with the many other detainees and officers around them." (*See id.*)

Petitioners sufficiently allege a concrete injury in the form of unsafe conditions at the NWDC, where five Petitioners are currently detained. The detention conditions are fairly traceable to Respondents, who keep Petitioners in detention. Finally, Petitioners' adequately allege that their injury "is likely to be redressed" by the relief Petitioners seek—release from the NWDC.

**B.      Jurisdiction Under 28 U.S.C. § 2241**

In addition to challenging Petitioners' Article III standing, Respondents also challenge this court's jurisdiction to adjudicate Petitioners' Fifth Amendment claim as a petition for a writ of habeas corpus because Plaintiffs' claim is about the conditions of their confinement, not the fact or duration of their confinement. (*See* 1st TRO Resp. at 11; 2d TRO Resp. at 2-3.) Petitioners disagree, and argue in part that they may pursue a

writ of habeas corpus because "their confinement is unlawful" and they are entitled to immediate release.  (*See* 2d TRO Mot. at 21 n.16.)

The court disagrees with Petitioners that this is not a conditions of confinement claim.  The basis for Petitioners' claim rests on specific conditions within the NWDC that Petitioners allege expose them to a greater risk of contracting COVID-19.  (*See* Pet. ¶¶ 67-73 (discussing case law regarding, *e.g.*, "conditions of reasonable health and safety" and "[c]onditions that pose an unreasonable risk of harm."), ¶ 84 (alleging that the NWDC's "conditions of confinement" subject Petitioners to a heightened risk of contracting COVID-19.); 2d TRO Mot. at 9 ("[A]nything less than aggressive screening and testing of all detainees, staff, officials and others who enter the facility is insufficient to contain COVID-19's spread."), ¶ 21 (discussing constitutional prohibitions on "unsafe prison conditions" and "detention conditions amounting to punishment").)  If those alleged conditions could be remedied—notwithstanding Petitioners' assertions that they cannot—Petitioners do not raise any separate challenge to the authority under which they were detained or the length of their detention.  (*See generally* Pet.; 1st TRO Mot.; 2d TRO Mot.)  Accordingly, this is a conditions of confinement case, and the court evaluates it as such.

The United States Supreme Court has not yet resolved the question of whether a conditions of confinement claim may be brought in the form of a petition for a writ of habeas corpus.  *See Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("Thus, we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the

confinement itself."). The majority of federal circuit courts allow detainees to challenge their conditions of confinement via a habeas petition. *See Aamer v. Obama*, 742 F.3d 1023, 1036-37 (D.C. Cir. 2014) (citing *United States v. DeLeon*, 444 F.3d 41, 59 (1st Cir. 2006); *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 & n.5 (3d Cir. 2005); *McNair v. McCune*, 527 F.2d 874, 875 (4th Cir. 1975); *Adams v. Bradshaw*, 644 F.3d 481, 482-83 (6th Cir. 2011)). The Ninth Circuit has not yet decided the issue. *See Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (holding that if a state prisoner's claim "would not necessarily spell speedier release," it does not lie at "the core of habeas corpus," and must be brought, if at all, under 42 U.S.C. § 1983; but explicitly stating that the Ninth Circuit would not address how this standard "applies to relief sought by prisoners in federal custody").

Nevertheless, a three-judge panel on the Ninth Circuit recently transferred to this district several emergency motions in other matters that the Ninth Circuit construed as habeas petitions. *See, e.g.*, Almeida Transfer Order; Patel Transfer Order; Pablo Transfer Order. In those emergency motions, like Petitioners' TRO motions here, the detainees challenge their detention at the NWDC based on conditions that allegedly increase the risk of COVID-19 infection. *See* Almeida Transfer Order at 2; Patel Transfer Order at 2; Pablo Transfer Order at 2. Like the Petition before this court, the transferred petitions challenge the conditions of confinement, not the fact or duration of confinement. *See generally Almeida*, No. C20-0490RSM-BAT, Almeida Pet. (Dkt. # 1) (W.D. Wash. Mar. 31, 2020); *Patel*, No. C20-0488RSM-BAT, Patel Pet. (Dkt. # 1) *//*

(W.D. Mar. 31, 2020); *Pablo*, No. C20-489RSM-BAT, Pablo Pet. (Dkt. # 1) (W.D. Wash. Mar. 31, 2020).

The Ninth Circuit's transfer orders holding that this district court should consider the transferred emergency motionss as habeas petitions are unpublished, and therefore the transfer orders do not definitively resolve this unsettled area of law. (*See* Almeida Transfer Order at 1; Patel Transfer Order at 1; Pablo Transfer Order at 1.) Nevertheless, because both the transferred emergency motions are similar to present Petition, this court will follow the Ninth Circuit's direction in the transfer orders—to adjudicate the emergency motions as petitions for writs of habeas corpus under 28 U.S.C. § 2241—and consider the present Petition under the rubric of 28 U.S.C. § 2241 as well.

## C. Standards for a TRO

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). A TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20).

//

1       As an alternative to this test, a preliminary injunction is appropriate if "serious

2   questions going to the merits were raised and the balance of the hardships tips sharply in

3   the plaintiff's favor," thereby allowing preservation of the status quo when complex legal

4   questions require further inspection or deliberation.  *All. for the Wild Rockies v. Cottrell*,

5   632 F.3d 1127, 1134-35 (9th Cir. 2011).  However, the "serious questions" approach

6   supports the court's entry of a TRO only so long as the plaintiff also shows that there is a

7   likelihood of irreparable injury and that the injunction is in the public interest.  *Id.* at

8   1135.  The moving party bears the burden of persuasion and must make a clear showing

9   that it is entitled to such relief.  *Winter*, 555 U.S. at 22.

10  **D.    Petitioners' Motion**

11      The court concludes that Petititioners have not made a clear showing that they are

12  entitled to the extraordinary remedy they request.

13      1.  Likelihood of Success on the Merits

14      To obtain a TRO, Petitioners must make a clear showing that they are likely to

15  succeed on the merits or, alternatively, have raised serious questions going to the merits

16  of their habeas petition on Fifth Amendment grounds.  To succeed on a habeas petition,

17  Petitioners must show that they are "in custody in violation of the Constitution or laws or

18  treaties of the United States."  *See* 28 U.S.C. § 2241.  For the reasons stated below, the

19  court concludes that Petitioners fail to make a clear showing that they are likely to

20  succeed on the merits of their claim or that they have raised serious questions going to the

21  merits.

22  //

When the government detains a person pursuant to an immigration violation, the person is a civil detainee. See *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). To evaluate the constitutionality of a pretrial detention condition under the Fifth Amendment, a district court must determine whether those conditions "amount to punishment of the detainee." *Bell*, 441 U.S. at 535; *see also Kingsley v. Hendrickson*, --- U.S. ---, 135 S. Ct. 2466, 2473-74 (2015). Punishment may be shown through an express intent to punish or a restriction or condition that "is not reasonably related to to a legitimate governmental objective." *Bell*, 441 U.S. at 539; *see also Kingsley*, 135 S. Ct. at 2473-74 (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose"). In addition, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).[9] Thus, for example, the government violates the Due Process Clause if it fails to provide civil detainees with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. In the context of a Due Process Clause failure-to-protect claim, the Ninth Circuit declared that "the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn on the facts and circumstances of each particular case.'"

---

[9] In *DeShaney*, the Supreme Court analyzed the petitioners' rights under the Fourteenth Amendment. *See* 489 U.S. at 194-95. Fifth Amendment due process claims and Fourteenth Amendment due process claims are analyzed in the same way. *See Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

1  *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (quoting *Kingsley*, 135 S. Ct.

2  at 2473) (alterations and internal quotation marks omitted).[10]

3        Petitioners do not present allegations or evidence to show an "express intent" to

4  punish Petitioners.  (*See generally* 2d TRO Mot.)  Moreover, Plaintiffs do not dispute that

5  preventing detained aliens from absconding and ensuring that they appear for removal

6  proceedings is a legitimate governmental objective.  See *Jennings v. Rodriguez*,

7  --- U.S. ---, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003);

8  *Zadvydas v. Davis*, 533 U.S. at 690-91.  Therefore, Petitioners may succeed on their Fifth

9  Amendment claim if their confinement is not reasonably related to to a legitimate

10  governmental objective or is excessive in relation to the legitimate governmental

11  objective, *see Kingsley*, 135 S. Ct. at  2473-74, or if Respondents fail to provide for

12  Petitioners' reasonable safety, *see DeShaney*, 489 U.S. at 200.[11]

13        As of the date of this order, there is no confirmed COVID-19 case among any

14  detainees, staff, or visitors at the NWDC.  Nevertheless, Petitioners contend that due to

---

16  [10] "[T]he Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure-to-protect claims." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019).

18  [11] In addition to Petitioners' Fifth Amendment arguments, Petitioners rely on a series of court orders regarding bail and other discretionary determinations relating to confinement or release. (*See* 2d TRO Mot. at 13-14 (citing, among other cases, *United States v. Stephens*, No. 15-CR-95 (AJN), 2020 WL 1295155, at *1 (S.D.N.Y. Mar. 19, 2020) (granting bail); *United States v. Raihan*, No. 20-cr-68 (BMC) (JO), Dkt. # 20 at 10:12-19 (E.D.N.Y. Mar. 12, 2020) (continuing a criminal defendant on pretrial release)).)  However, the decisions courts make with respect to bail, in addition to the other discretionary determinations, bear little on the task before the court, which involves adjudicating Petitioners' claim that Respondents violate their Fifth Amendment rights.  That weighty analysis cannot be conducted on the basis of discretionary decisions made with respect to individuals and circumstances not before this court.

the rampant spread of COVID-19, it will inevitably sweep through the NWDC, and when it does, Petitioners will be powerless to protect themselves because they are unable to engage in the necessary physical distancing.  (*See* 2d TRO Mot. at 2 (asserting that the COVID-19 pandemic "will, if it has not already," reach the NWDC).)  Petitioners assert that "[p]reventive measures that may be effective . . . such as remaining separated from other persons and frequent disinfection after occasional contact with other persons, are simply not possible in the detention setting."  (*See id.* at 22-23).

  At the outset, the court rejects as irrelevant Petitioners' evidence of the conditions at detention facilities or jails that are not at issue in this case.  For example, Drs. Allen and Rich testify about the potential risks to immigrant detainees generally due to the COVID-19 pandemic.  (*See generally* Allen-Rich Ltr.)  The court does not dismiss these concerns but notes that nothing in Drs. Allen and Rich's letter addresses the actual conditions at the NWDC.  (*See generally id.*)  Instead, Drs. Allen and Rich point to reported conditions at prisons in China and Iran, the presence of COVID-19 at New York's Rikers Island, the possible presence of COVID-19 among immigrant detainees at ICE's Aurora facility, and a reported positive COVID-19 test for a member of ICE's medical staff at a detention center in New Jersey.  (*See id.* at 3.)  The fact that other immigration detention centers "have faced outbreaks of other infectious diseases in recent years," or that, for example, "ICE mishandled and failed to take adequate measures to protect detainees in Virginia," is not evidence of the conditions facing Petitioners at the NWDC in this case.  (*See id.* at 9; *see also* Stern Decl. (Dkt. # 6) ¶ 7 (discussing the conditions of "detention facilities" but not conditions at the NWDC specifically); 1st

Greifenger Decl. (Dkt. # 4) ¶¶ 10-12 (discussing the conditions at "[m]any immigration detention facilities"); Lorenzen-Strait Decl. (Dkt. # 40) ¶¶ 1-16 (discussing ICE policies generally).)

In contrast to the conditions at other facilities, here, Respondents submit evidence that they are taking substantial measures at this moment to prevent an outbreak of COVID-19 at the NWDC and contain an outbreak should one occur. Those measures include, among others, (1) policies under which the "[t]he last transfer of ICE detainees the [NWDC] received from the southern border occurred on or about March 5, 2020" (*see* 1st Bostock Decl. ¶ 6); (2) exercising discretion to delay enforcement actions that limit the number of new detainees at the NWDC (*id.* ¶¶ 8-9); (3) "temperature and prescreening checks of all new detainees arriving at the [NWDC] prior to entrance to the facility" (*id.* ¶ 11); (4) providing each detainee an instructional flyer "outlining proper hand washing hygiene and the importance of covering coughs" and placing in each housing unit "additional posters in multiple languages concerning hand washing hygiene and covering coughs" (*id.* ¶ 13); (5) enhancing cleaning measures, including "increased emphasis on cleaning contact areas with disinfectant cleaners approved as effective against COVID 19" (*id.* ¶ 16); (6) providing "[s]oap and cleaning supplies" to "detainees in all housing unites and work areas" (*id.* ¶ 17); (7) conducting weekly meetings "to educate detainees on hand washing and covering coughs" (*id.* ¶ 18); (8) suspending social visitation and cancelling all tours (*id.* ¶¶ 19-20); (9) providing extra hand sanitizer to ICE employees and disinfectant wipes so they can conduct extra cleaning of "high contact areas" such as door handles, phones, and computers (*id.* ¶ 23); (10) instituting

temperature checks and instructing ICE and GEO employees to stay home if they are sick or have been in close contact with someone diagnosed with COVID-19 (*id.* ¶ 25); and (11) implementing a telework program under which only half of ERO employees are present at the NWDC at any one time (*id.* ¶ 26).  Further, the court notes that Respondents have made the discretionary decision to release four Petitioners, which provides these individuals with all of the relief they request pursuant to the present motion.  (*See* 1st Not. of Release at 1; 2d Not. of Release at 1; 3d Not. of Releaese at 1.)

These measures generally track the recommendations of DHS's medical subject matter experts and other public health authorities in responding to COVID-19.  (*See* Allen-Rich Ltr. at 6 (recommending processes for screening, testing, isolation and quarantine, limiting transport and transfer of immigrant detainees, rapidly identifying a positive COVID-19 case, "consultation with CDC and public health officials to forge optimal infection prevention control strategies to mitigate the health risks to detained patient populations and correctional workers," and considering the release of detainees who do not pose an immediate risk to public safety); 1st Bostock Decl. ¶ 28.)  Although Drs. Allen and Rich may recommend "releasing all detainees in high risk medical groups" (*see* Allen-Rich Ltr. at 6), Respondents cannot do so without first assessing whether such release is otherwise authorized by law and in the public's interest in any given case.  Indeed, ICE is presently engaged in such a case-by-case analysis and has begun to release high-risk detainees on this basis.  (*See* 1st Bostock Decl. ¶¶ 31-32.)

Nevertheless, Petitioners raise additional concerns in declarations filed on April 3, 2020, regarding their ability to maintain social distancing in all circumstances while

detained.  (*See, e.g.*, Dawson Decl. ¶¶ 4-5; Espinoza-Esparza Decl. ¶¶ 5-6; Gonzalez

Decl. ¶ 4.)  Indeed, Drs. Allen and Rich recommend implementing "immediate social

distancing to reduce the likelihood of exposure to detainees, facility personnel, and the

general public."  (*See* Allen-Rich Ltr. at 6.)  Nevertheless, under the Fifth Amendment,

Respondents are not required to eliminate any risk to Petitioners.  Instead, Respondents

are required to provide for their "reasonable safety."  *See DeSahney*, 489 U.S. at 200.  In

the face of the measures Respondents are taking to prevent and contain a potential

COVID-19 outbreak, Petitioners' evidence of current conditions at the NWDC is

insufficient to warrant the "extraordinary relief" of a TRO.  The court is persuaded from

the evidence filed in this case that Respondents are taking active and substantial measures

to respond to a unique, unprecedented, and extremely challenging public health crisis.

These measures create conditions that are reasonably related and not excessive in relation

to the government's interests in preventing flight and protecting public safety—

particularly when ICE is not authorized by statute to release several Petitioners and has

legitimate concerns about releasing others with extensive criminal histories.  Moreover,

Respondents' measures generally track the recommendations of public health authorities.

(*See* Allen-Rich Ltr. at 6.)

    The court is aware that other district courts in other parts of the country have

recently granted TRO motions in favor of immigration detainees on Fifth Amendment

grounds.  However, the evidence of current conditions at the NWDC differs in significant

ways from the evidence before those other district courts.  *See, e.g.*, *Basank*, 2020 WL

1481503, at *7 ("Each of the jails where a Petitioner is being housed has reported

confirmed cases of COVID-19."); *Coronel*, 2020 WL 1487274 at *4 (stating that, unlike

in this case, "the record demonstrates that ICE has not taken any action to address the

particular risks COVID-19 poses to high-risk individuals"); *Castillo*, 2020 WL 1502864

at *1 (stating that "[o]ver the years, and as recently as 2018, DHS's Office of the

Inspector General had, repeatedly, found that significant and various health and safety

risks existed at Adelanto"). It would be improper for this court to rely on conditions at

other detention facilities to conclude that the conditions at the NWDC represent a Fifth

Amendment violation.

      2. <u>Likelihood of Irreparable Harm</u>

      The court also concludes that Petitioners do not meet their burden to show that

"irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. As

discussed above, given the measures Respondents are currently taking, the court cannot

conclude either that the spread of COVID-19 inside the NWDC is inevitable, or that

Respondents will be unable to contain it if it occurs. No one can entirely guarantee safety

in the midst of a global pandemic. However, the standard under which the court

evaluates Petitioners' second TRO motion is not guaranteed safety—an impossible

standard to meet no matter the circumstances—but rather a likelihood of irreparable

harm. The evidence before the court does not meet that standard. Therefore, the court

DENIES Petitioners' second motion for a TRO.[12]

//

---

[12] Having concluded that Petitioners fail to meet the first two prongs of the TRO standard, the court finds it unnecessary to address the third and fourth prongs.

# IV.   CONCLUSION

For the foregoing reasons, the court DENIES Petitioners' second motion for a temporary restraining order (Dkt. # 36) and ORDERS Respondents to inform Petitioners and the court as soon as practicable but within at least 24 hours after learning that any individual physically present at the NWDC tests positive for or is otherwise diagnosed with COVID-19.

Dated this 8th day of April, 2020.

JAMES L. ROBART
United States District Judge