1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KARLENA DAWSON, et al.,

                Petitioner-Plaintiffs,

    v.

NATHALIE ASHER, et al.,

                Respondent-Defendants.

Case No. C20-0409-JLR-MAT

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Before the Court is Respondent-Defendants Nathalie Asher, Matthew Albence, Steven Langford, and U.S. Immigration and Customs Enforcement's ("ICE") (collectively, "Respondents") return memorandum and motion to dismiss. (Mot. (Dkt. 94).) Petitioner-Plaintiffs Karlena Dawson, Alfredo Espinoza-Esparza, Norma Lopez Nunez, Marjoris Ramirez-Ochoa, Maria Gonzalez-Mendoza, Joe Hlupheka Bayana, Leonidas Plutin Hernandez, and Kelvin Melgar-Alas (collectively, "Petitioners") oppose dismissal and ask the Court to grant their 28 U.S.C. § 2241 habeas petition and complaint for injunctive relief ("Petition").[1] (Resp. (Dkt. 104).) Having considered the parties' submissions, the balance of the record, and the applicable law, the Court

_____

[1] The parties agree that Petitioner Jesus Gonzalez Herrera's claims are moot because he has been removed.

REPORT AND RECOMMENDATION - 1

1  recommends that Respondents' motion to dismiss be GRANTED, Petitioners' habeas petition and

2  complaint for injunctive relief be DENIED, and this action be DISMISSED with prejudice.[2]

3  II.     <u>BACKGROUND</u>

4  A.   <u>Procedural History</u>

5       On March 16, 2020, Petitioners initiated this action to obtain release from detention at the

6  Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington, a private detention facility

7  run by The GEO Group, Inc. ("GEO"). (Pet. (Dkt. 1) at 20; 2d Bostock Decl. (Dkt. 96) ¶ 4.)

8  Petitioners represent that they are "particularly vulnerable to serious illness or death if infected by

9  COVID-19" due to their age and/or medical conditions. (Pet. ¶¶ 39-66.) The same day, Petitioners

10 filed their first motion for a temporary restraining order ("TRO") seeking their immediate release.

11 (1st TRO Mot. (Dkt. 2) at 7.) Petitioners argued that "[t]he conditions of immigration detention

12 facilities pose a heightened public health risk for the spread of COVID-19" because of "crowding,

13 the proportion of vulnerable people detained, and often scant medical care resources," in addition

14 to the inability to achieve the social distancing needed to effectively prevent the spread of

15 COVID-19. (*Id.*) Petitioners contended that their continued detention in the face of the COVID-

16 19 pandemic violated their Fifth Amendment right to reasonable safety while in custody. (*Id.* at

17 12.) Respondents opposed the motion and argued that Petitioners lacked Article III standing and

18 that the court lacked jurisdiction to hear Petitioners' claim in the form of a habeas petition. (1st

19 TRO Resp. (Dkt. 28) at 7-11.)

20      On March 19, 2020, the Honorable James L. Robart denied Petitioners' first TRO motion

21 because Petitioners had not shown a likelihood of success on the merits or a likelihood of

22 irreparable harm. (3/19/20 Order (Dkt. 33) at 4-6.) The following day, Judge Robart ordered

23

---

[2] The parties have thoroughly briefed the issues before the Court, and therefore Petitioners' request for oral argument (Resp. at 1) is DENIED.

Petitioners to respond to Respondents' arguments regarding Article III standing. (OSC (Dkt. 34) at 2.)

On March 24, 2020, Petitioners filed their second TRO motion, and on March 25, 2020, they filed their response to Judge Robart's order to show cause. (2d TRO Mot. (Dkt. 36); OSC Resp. (Dkt. 46).) Petitioners' second TRO motion was premised on the following developments: (1) the Ninth Circuit Court of Appeals' March 23, 2020 *sua sponte* order releasing an individual from immigration detention "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers" (2d TRO Mot. at 2 (quoting *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877, at *1 (9th Cir. Mar. 24, 2020) (unpublished))); (2) other federal court orders releasing individuals "on bail or delay[ing] their imprisonment in light of the COVID-19 crisis" (*id.*); (3) a letter from "two doctors who serve as subject matter experts" for the U.S. Department of Homeland Security ("DHS") warning of "tinderbox" conditions at immigration detention centers (*id.* at 2-3 (citing Ngo Decl. (Dkt. 37) ¶ 4, Ex. A ("Allen-Rich Ltr.") at 4)); and (4) the fact that individuals have tested positive for COVID-19 "at other immigration detention facilities in the United States" (*id.* at 3). On March 30, 2020, Respondents filed a response to Petitioners' second TRO motion and a reply to the order to show cause. (2d TRO Resp. (Dkt. 64); OSC Reply (Dkt. 63).)

On April 8, 2020, after obtaining additional evidence from the parties regarding the conditions at the NWIPC, Judge Robart denied Petitioners' second TRO motion. (4/8/2020 Order (Dkt. 91).) Judge Robart concluded that Petitioners had Article III standing and that they could pursue their Fifth Amendment claims as a petition for writ of habeas corpus. (*Id.* at 18-21.) With respect to the merits, Judge Robart explained that Petitioners could succeed on their Fifth Amendment claims if their confinement was not reasonably related to a legitimate governmental

1    objective, was excessive in relation to the legitimate governmental objective, or if Respondents

2    failed to provide for their reasonable safety. (*Id.* at 24.) At the outset, Judge Robart rejected as

3    irrelevant Petitioners' evidence regarding the conditions at detention facilities or jails other than

4    the NWIPC, including the opinions of Drs. Allen and Rich. (*Id.* at 25.) In contrast to the conditions

5    at other facilities, Judge Robart noted, Respondents had submitted evidence that they were taking

6    "substantial measures" to prevent an outbreak of COVID-19 at the NWIPC and to contain an

7    outbreak should one occur. (*Id.* at 26.) Based on the evidence presented, Judge Robart was

8    persuaded that Respondents were providing for Petitioners' reasonable safety by "taking active

9    and substantial measures to respond to a unique, unprecedented, and extremely challenging public

10   health crisis." (*Id.* at 28.) Judge Robart explained, "These measures create conditions that are

11   reasonably related and not excessive in relation to the government's interests in preventing flight

12   and protecting public safety—particularly when ICE is not authorized by statute to release several

13   Petitioners and has legitimate concerns about releasing others with extensive criminal histories."

14   (*Id.* at 28.) Thus, Judge Robart concluded that Petitioners had not shown a likelihood of success

15   or serious questions going to the merits of their Fifth Amendment claims. (*Id.* at 22.) However,

16   because an active COVID-19 case at the NWIPC would present a "significant development,"

17   Judge Robart ordered Respondents to inform the court within 24 hours after learning that any

18   individual physically present at the NWIPC tests positive or is otherwise diagnosed with COVID-

19   19. (*Id.* at 12 n.7.)

20          On April 9, 2020, the Court ordered Respondents to file a habeas return within 30 days.

21   (4/9/2020 Order (Dkt. 92).) On April 30, 2020, Respondents filed the habeas return and motion to

22   dismiss that is currently before the Court. (Mot.) On May 18, 2020, Petitioners filed their response.

23   (Resp.) On May 22, 2020, Respondents filed their reply. (Reply (Dkt. 121).) Respondents also

REPORT AND RECOMMENDATION - 4

have filed a number of notices in response to Judge Robart's April 8, 2020 order requiring them to apprise the Court of any COVID-19 diagnoses. (1st COVID-19 Not. (Dkt. 93); 2d COVID-19 Not. (Dkt. 100); 3rd COVID-19 Not. (Dkt. 103); 4th COVID-19 Not. (Dkt. 126); 3d Malakhova Decl. (Dkt. 127); 5th COVID-19 Not. (Dkt. 128); 6th COVID-19 Not. (Dkt. 131); 7th COVID-19 Not. (Dkt. 132); 8th COVID-19 Not. (Dkt. 133); 9th COVID-19 Not. (Dkt. 134); 10th COVID-19 Not. (Dkt. 136).)

B.     Conditions of Confinement

       The parties rely on a series of declarations in support of and opposition to Respondents' motion to dismiss. Respondents rely primarily on the declarations of (1) Drew Bostock, the Officer in Charge with ICE Enforcement and Removal Operations ("ERO") in the Seattle Field Office ("ERO Seattle") (2d Bostock Decl.); (2) Jack Lippard, the Assistant Officer in Charge with ERO Seattle (Lippard Decl. (Dkt. 123)); (3) Steven Langford, the NWIPC Facility Administrator (1st Langford Decl. (Dkt. 74); 2d Langford Decl. (Dkt. 120)); and (4) Dr. Sheri Malakhova, the Clinical Director for the ICE Health Services Corps ("IHSC") (1st Malakhova Decl. (Dkt. 97); 2d Malakhova Decl. (Dkt. 124); 3rd Malakhova Decl. (Dkt. 127-1)).

       Petitioners rely primarily on (1) individual declarations from Petitioners and other current and former NWIPC detainees (*see, e.g.*, Dawson Decl. (Dkt. 78); Espinoza-Esparza Decl. (Dkt. 79); Gonzalez Decl. (Dkt. 80); 1st Lopez Nunez Decl. (Dkt. 81); Hernandez Decl. (Dkt. 82); Juarez Decl. (Dkt. 108); Avendano Decl. (Dkt. 109); Bonarov Decl. (Dkt. 110); Reyes Decl. (Dkt. 111); Adekunle Decl. (Dkt. 113)); (2) expert declarations from infectious disease specialists, medical professionals, and administrators with expertise in civil and criminal detention systems (*see, e.g.*, 1st Greifinger Decl. (Dkt. 4); 2d Greifinger Decl. (Dkt. 59); 3rd Greifinger Decl. (Dkt. 77); Golob Decl. (Dkt. 5); Stern Decl. (Dkt. 6); Amon Decl. (Dkt. 106); Schriro Decl. (Dkt. 107)); and (3)

1   declarations from counsel who have visited their clients at the NWIPC during the COVID-19

2   pandemic (*see, e.g.*, Augustine Decl. (Dkt. 83); Nerheim Decl. (Dkt. 112)).

3       1.      *Detainee Testing and COVID-19 Positive Detainees*

4       Prior to May 28, 2020, COVID-19 tests at the NWIPC were administered solely based on

5   guidance issued by the U.S. Centers for Disease Control ("CDC"). (2d Malakhova Decl. ¶¶ 2, 4;

6   Rivera Decl. (Dkt. 65) ¶ 8.) This guidance directs clinicians to use their judgment in determining

7   if a patient has signs and symptoms consistent with COVID-19. (2d Malakhova Decl. ¶¶ 4, 6;

8   Rivera Decl. ¶ 8.) Any detainee who is positive or "presumptively positive" is placed in an

9   individual unit in the Medical Housing Unit ("MHU"). (2d Malakhova Decl. ¶ 7.) The MHU has

10  eight isolation rooms, which include four negative pressure rooms designed to help prevent the

11  spread of airborne particles. (*Id.*) Two empty housing units are also designated as medical overflow

12  units in the event that space runs out at the MHU. (*Id.*)

13      Between May 28 and June 2, 2020, ICE tested all detainees at the NWIPC who consented

14  to a COVID-19 test. (3rd Malakhova Decl. ¶ 3.) Of the 561 detainees housed at the NWIPC at the

15  time, 449 of the 450 detainees tested negative for COVID-19, and 111 detainees refused testing.

16  (*Id.*) The one detainee who tested positive arrived at the NWIPC on May 29, 2020, and was still

17  in his 14-day quarantine period in the New Intake Monitoring Unit. (*Id.* ¶ 4.) After receiving the

18  positive test result, ICE moved the detainee to an airborne infection isolation room in the MHU

19  for observation, and he remained there until he received two negative test results. (*Id.*) His

20  cellmate, who tested negative for the virus, remained in the intake unit for 14 more days on medical

21  observation. (*Id.*)

22      Since this initial round of testing, a handful detainees have tested positive prior to their

23  transfer to the NWIPC or upon intake. Several detainees were suspected or confirmed to have

COVID-19 prior to their transfer; they were required to wear masks during their transfer to the NWIPC and transport staff were required to wear personal protective equipment ("PPE"). (*See* 2d COVID-19 Not. at 4; 3rd COVID-19 Not., Ex. A (5/15/2020 Bostock Decl.) ¶ 7; *see also* 7th COVID-19 Not., Ex. A (7/9/2020 Lippard Decl.) ¶ 5 (transport staff and detainee wore masks where detainee was not suspected to have COVID-19); 8th COVID-19 Not., Ex. A (7/15/2020 Lippard Decl.) ¶ 5 (same); 9th COVID-19 Not., Ex. A (7/16/2020 Lippard Decl.) ¶ 5 (same); 10th COVID-19 Not., Ex. A (8/13/2020 Bostock Decl.) ¶ 5.) All the detainees who have tested positive were either immediately placed in medical segregation or quarantined in the intake unit pending their test results and then transferred to medical segregation. (2d COVID-19 Not. at 5; 3rd COVID-19 Not., Ex. A ¶ 8; 4th COVID-19 Not., Ex. A (6/5/2020 Bostock Decl.) ¶¶ 3, 5; 5th COVID-19 Not., Ex. A (6/14/2020 Bostock Decl.) ¶¶ 3-4; 6th COVID-19 Not., Ex. A (6/1/2020 Bostock Decl.) ¶ 3; 7th COVID-19 Not., Ex. A ¶¶ 3-4; 8th COVID-19 Not., Ex. A ¶¶ 3-4; 9th COVID-19 Not., Ex. A ¶¶ 3-4; 10th COVID-19 Not., Ex. A ¶¶ 3-4.) The IHSC personnel who performed the medical intake screenings were wearing full PPE. (2d COVID-19 Not. at 4; 3rd COVID-19 Not., Ex. A ¶ 8; 6th COVID-19 Not., Ex. A ¶ 4; 7th COVID-19 Not., Ex. A ¶ 5; 8th COVID-19 Not., Ex. A ¶ 5; 9th COVID-19 Not., Ex. A ¶ 5; 10th COVID-19 Not., Ex. A ¶ 5.) The detainees were only released to the general population after being medically cleared. (2d COVID-19 Not. at 5; 3rd COVID-19 Not., Ex. A ¶ 10; 4th COVID-19 Not., Ex A ¶ 4; 5th COVID-19 Not., Ex. A ¶ 4; 7th COVID-19 Not., Ex. A ¶ 3; 8th COVID-19 Not., Ex. A ¶¶ 3-4; 9th COVID-19 Not., Ex. A ¶ 4; 10th COVID-19 Not., Ex. A ¶ 4.)

As of August 13, 2020, the date of Respondents' most recent notice, more than 745 COVID-19 tests have been administered to NWIPC detainees, and no detainee in the general population has tested positive. (10th COVID-19 Not., Ex. A ¶ 6.)

1
2. *Newly-arrived Detainees*

2
Upon admission to the NWIPC, detainees are screened by IHSC staff "to identify

3
requirements for medical care, special needs and housing, and to protect the health and safety of

4
others in the facility." (2d Bostock Decl. ¶ 15 (quoted source omitted).) Effective March 26, 2020,

5
IHSC implemented temperature and verbal prescreening checks of all new detainees arriving at

6
the facility. (*Id.*) Effective June 4, 2020, IHSC implemented voluntary COVID-19 testing during

7
the intake screening process. (3d Malakhova Decl. ¶ 5.) IHSC and GEO staff who participate in

8
the intake process and come into close contact with detainees are required to wear masks. (*See* 1st

9
Malakhova Decl. ¶ 7; 2d Langford Decl. ¶ 1.17.)

10
Incoming detainees who do not meet the requirements for immediate placement in medical

11
isolation are placed in one of the three New Intake Monitoring Units for a 14-day observational

12
period and are not permitted to comingle with other detainees. (2d Bostock Decl. ¶ 18.) Two of

13
these units are for male detainees and one is for female detainees. (*Id.*) These units are comprised

14
of separate cells that hold up to four detainees, meaning that newly-arrived detainees with no

15
symptoms of COVID-19 are housed with no more than three other people. (*Id.*) In addition,

16
detainees who consent to intake testing for COVID-19 are not housed in the same cells as detainees

17
who decline consent. (3rd Malakhova Decl. ¶ 5.) Detainees who test positive for COVID-19 are

18
immediately transferred to the MHU for monitoring. (*Id.*)

19
After the 14-day isolation period is complete, detainees without symptoms of COVID-19

20
are released into the general population. (2d Bostock Decl. ¶ 18.)

21
3. *Social Distancing Measures*

22
The NWIPC has the capacity to house 1,575 detainees and historically operates near

23
capacity. (2d Bostock Decl. ¶ 6.) As of May 19, 2020, however, the NWIPC housed only 600

detainees. (Lippard Decl. ¶ 4.) By August 13, 2020, ICE had further reduced the detainee population to 471, less than 30% of the facility's capacity. (10th COVID-19 Not., Ex. A ¶ 6.) In addition to significantly reducing the detainee population, ICE has redistributed the population among housing units to allow for greater social distancing. (1st Bostock Decl. (Dkt. 66) ¶¶ 25-28; Lippard Decl. ¶ 21; 2d Langford Decl. ¶¶ 1.3-1.5.) As of May 21, 2020, none of the fifteen units containing detainees were operating at great than 60% capacity. (2d Langford Decl. ¶ 1.5.) Starting the week of April 6, 2020, ICE and GEO began interviewing certain high-risk detainees to see if they would agree to special accommodations, such as single cells or more sparsely-populated units. (2d Bostock Decl. ¶ 28.) In addition to spreading out the detainee population across the facility, Respondents have attempted to minimize commingling between different housing units by assigning specific times for recreation, religious services, and use of the law library. (*Id.* ¶ 30.) Detainees are also permitted to eat at their beds to practice greater social distancing rather than sit next to each other at tables during mealtimes. (*Id.* ¶ 29.) Beginning April 17, 2020, GEO began distributing surgical face masks to detainees for voluntary use. (*Id.* ¶ 24.) GEO offers new masks to detainees three times per week, and detainees are instructed to contact their unit staff if a mask needs to be replaced prior to the next issuance date. (*Id.*)

Notwithstanding the reduced detainee population, detainees report sharing limited bathroom, bathing, and handwashing facilities with those in their housing units, as well as tablets, exercise equipment, phones, and various other surfaces throughout the day.[3] (Juarez Decl. ¶¶ 3-6; Avendano Decl. ¶¶ 9-12.) Beds are placed very close together. (Juarez Decl. ¶ 3; Avendano Decl. ¶¶ 5, 10, 12; Bonarov Decl. ¶ 4; Reyes Decl. ¶ 20.) Other activities, including attending

---

[3] Petitioners submit declarations from several current and former detainees that are from late March or early April 2020. (Dawson Decl.; Espinoza-Esparza Decl.; Gonzalez Decl.; 1st Lopez Nunez Decl.; Hernandez Decl.) Given the evidence in the record regarding changes in ICE and GEO policies and practices that have occurred since this time, the Court does not find these declarations probative of current conditions and declines to rely on them here.

1   immigration court, waiting for medical appointments, or participating in daily one-hour recreation

2   times, also place detainees into close contact. (Juarez Decl. ¶¶ 9-10; Avendano Decl. ¶ 13; Bonarov

3   Decl. ¶ 14.) In short, detainees attest that maintaining social distance is impossible. (Juarez Decl.

4   ¶¶ 3, 5-6; Avendano Decl. ¶¶ 6, 14; Reyes Decl. ¶ 20.)

5           4.   *Hygiene Measures*

6           Under ICE's current protocols for COVID-19 response, high-touch areas at the NWIPC

7   must be cleaned and disinfected multiple times per day. (2d Bostock Decl. ¶ 20.) GEO has also

8   implemented enhanced measures in housing units, food preparation and service areas, and intake

9   rooms. (*Id.* ¶ 21.) GEO delegates responsibility for maintaining the cleanliness of its facilities to

10  detainees, who are engaged as part of the NWIPC's Voluntary Work Program. (Lippard Decl. ¶

11  13.) A GEO Sanitation Officer is responsible for monitoring the detainee workers, and GEO has

12  enrolled and trained at least 14 additional workers to conduct enhanced cleaning. (*Id.*)

13          Some detainees report that GEO and ICE fail to adequately supervise the cleaning and, as

14  a result, common areas and shared devices, like phones and tablets, are not always adequately

15  cleaned between uses. (Reyes Decl. ¶ 11; Adekunle Decl. ¶¶ 9-11.) Detainees also report that they

16  run out of supplies, such as soap and paper towels. (Juarez Decl. ¶ 6; Reyes Decl. ¶ 12; Adekunle

17  Decl. ¶ 8.) Nevertheless, detainees have not submitted kites to ICE or GEO complaining about

18  insufficient hygiene and cleaning supplies, and GEO makes cleaning supplies available to all

19  general population detainees so they can clean high-contact surfaces before and after their

20  individual use. (*See* Lippard Decl. ¶¶ 10-15.)

21          5.   *Visitors and Staff*

22          ICE has temporarily suspended social visitation at the NWIPC. (2d Bostock Decl. ¶ 33;

23  Lippard Decl. ¶ 7(l).) However, attorneys, contractors, and religious service providers still enter

the facility and interact with detainees. (2d Bostock Decl. ¶ 35; Lippard Decl. ¶¶ 7(l)-(n).) Visitors are required to wear PPE (2d Bostock Decl. ¶ 36), but Petitioners present the declaration of attorney Andrew Augustine, who attests that on March 31 and April 2, 2020, he appeared for immigration court hearings at the NWIPC and was not required to wear PPE. (Augustine Decl. ¶¶ 2-3, 8-11.)

On March 27, 2020, ICE and GEO implemented COVID-19 screening temperature checks for all employees entering the NWIPC. (2d Bostock Decl. ¶ 38.) In compliance with CDC recommendations, masks are required for all ICE and GEO staff in the medical clinic and MHU. (*Id.* ¶ 39; Lippard Decl. ¶ 19.) Although the CDC does not have a general recommendation that all facility staff in near proximity to detainees wear face masks, on April 6, 2020, ERO Seattle requested that any of its officers who have contact with detainees voluntarily wear masks. (Lippard Decl. ¶ 19; 2d Bostock Decl. ¶ 38.) Officers Bostock and Lippard attest that they have observed and believe that all ERO Seattle officers have been voluntarily complying with this request. (Lippard Decl. ¶ 20; 2d Bostock Decl. ¶ 38.) GEO requires its employees in the intake unit to wear masks and has encouraged but not required other staff to do so. (2d Bostock Decl. ¶ 38; Lippard Decl. ¶ 20.) On May 11, 2020, ERO Seattle was informed that GEO Corporate had agreed to implement a mandatory mask policy for all of its employees who are in close proximity with detainees, but as of May 22, 2020, ERO Seattle had not yet received notice from GEO of the date this would be fully implemented at the NWIPC. (Lippard Decl. ¶ 20.)

In declarations dated around the end of April and beginning of May 2020, detainees report that most guards do not wear masks and some refuse when asked. (Juarez Decl. ¶¶ 13-14 ("If I or other detainees ask the guards to put on masks, they will laugh at us and tell us that it is not required."); Avendano Decl. ¶ 16; Bonarov Decl. ¶ 10; Reyes Decl. ¶ 21; Adekunle Decl. ¶ 11.) Another attorney testifying on behalf of Petitioners, Mark Nerheim, corroborates detainees'

accounts of GEO staff's general refusal to wear masks. Specifically, Mr. Nerheim claims that in late March or early April 2020, he "witnessed a very cavalier attitude" by some guards in terms of adhering to COVID-19 protocols, including refusal to complete facility entrance forms, ignoring safe distancing protocols, and refusal to wear masks. (Nerheim Decl. ¶¶ 5-6.) NWIPC Facility Administrator Stephen Langford disputes Mr. Nerheim's claims of unprofessionalism and attests that GEO staff take COVID-19 precautions seriously and invest in meeting CDC guidelines. (2d Langford Decl. ¶ 1.31.)

As of May 20, 2020, 13 NWIPC GEO employees had been tested for COVID-19, and all test results were negative. (Lippard Decl. ¶ 6; *see also* 2d Langford Decl. ¶ 1.29 ("There are no reported positive test results for any GEO employee.").) Additionally, as of May 22, 2020, two ICE employees and one ICE contractor at the NWIPC had been tested for COVID-19 and all had negative results. (*Id.*)

C.    Petitioners and Their Detention Statuses

Three Petitioners remain detained at the NWIPC. Mr. Bayana is 57 years old and a citizen of Zimbabwe who has type II diabetes and takes medication for seizures. (1st Bayana Decl. (Dkt. 13) ¶¶ 1, 3-4.) Respondents believe his real name is Mketwa Phiri and that Joe Hlupheka Bayana is a false name that Mr. Bayana has used on a fraudulently obtained South African passport, which Mr. Bayana presented to an immigration judge to obtain bond on May 16, 2002. (*See* 1st Bostock Decl. at ¶ 38.) After accepting an order of voluntary departure to South Africa, Mr. Bayana failed to depart voluntarily and subsequently failed to report for removal twice. (*See id.*) Mr. Bayana has been arrested approximately 22 times for charges that include trespassing, larceny, drugs, assault, and harassing communications. (*See id.*) Mr. Bayana was an immigration fugitive from August 30, 2012, until April 5, 2018. (*See id.*) After applying for work authorization, ICE took Mr. Bayana

into custody on October 17, 2018. (*See id.*) The South African government subsequently notified ICE and provided documentation confirming that the real Joe Hlupheka Bayana was deceased, establishing that Joe Hlupheka Bayana is not Mr. Bayana's real name. (*See id.*)

Mr. Melgar-Alas is 40 years old and a citizen of El Salvador who has been in a wheelchair since a September 27, 2015, shooting that resulted in a spinal cord injury. (1st Melgar-Alas Decl. (Dkt. 15) ¶¶ 1, 4.) Mr. Melgar-Alas has a colonoscopy bag and "has to catheterized (sic) up to five times each day." (*Id.* ¶ 6.) Since first being detained at the NWIPC in July 2018, he has been hospitalized five times, "including multiple times for probable pneumonia." (*Id.* ¶ 7.) Mr. Melgar-Alas has convictions for distribution of methamphetamine and was convicted in 2013 of a RICO offense for his membership and participation in the Mara Salvatrutcha gang, also known as MS-13. (1st Bostock Decl. ¶ 40.) He was sentenced to 27 months in prison and released to ICE on July 18, 2018. (*Id.*) On February 6, 2020, an immigration judge denied Mr. Melgar-Alas bond, finding him to be both a danger and a flight risk. (*See id.*)

Ms. Lopez Nunez is a 65-year-old citizen of Mexico who suffers from hypertension, heart disease, and mental health issues. (1st Maltese Decl. (Dkt. 8) ¶ 9, Ex. C; 2d Lopez Nunez Decl. (Dkt. 115) at ¶¶ 8-9.) She also has a leg injury that makes walking difficult. (2d Lopez Nunez Decl. at ¶ 9.) She needs assistance from other detainees or a nurse to get in and out of bed, get her meals, and use the bathroom. (*Id.* at ¶ 10.) Ms. Lopez Nunez has multiple prior removals and approximately five prior convictions for illegal re-entry. (1st Bostock Decl. ¶ 35.) She has been in ICE custody since 2015 and has been denied bond multiple times after being found to be a flight risk. (*Id.*)

ICE has released the remaining Petitioners from the NWIPC. On March 25, 2020, ICE released Mr. Espinoza-Esparza and Mr. Plutin Hernandez. (1st Not. of Release (Dkt. 57) at 1.) On

1    March 30, 2020, ICE released Ms. Dawson on an order of supervision. (2d Not. of Release (Dkt.

2    70) at 1.) On April 6, 2020, ICE released Ms. Gonzalez-Mendoza on an order of release on

3    recognizance. (3rd Not. of Release (Dkt. 88) at 1.) On July 23, 2020, ICE released Ms. Ramirez-

4    Ochoa on an order of supervision. (4th Not. of Release (Dkt. 135) at 1.)

5                                  III.    <u>DISCUSSION</u>

6           The primary disputes between the parties are whether the claims by the Petitioners who

7    have been released from the NWIPC are moot, and whether the conditions at the NWIPC violate

8    Petitioners' Fifth Amendment[4] substantive due process rights to (1) reasonably safe conditions of

9    confinement and (2) conditions that do not amount to punishment. As discussed below, the Court

10   concludes that Petitioners' claims are not moot and that the conditions at the NWIPC do not violate

11   their constitutional rights.

12   A.    <u>Mootness</u>

13          "Federal courts lack jurisdiction to consider moot claims." *Rosemere Neighborhood Ass'n*

14   *v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1172 (9th Cir. 2009) (citing *Church of Scientology v.*

15   *United States*, 506 U.S. 9, 12 (1992)). The mootness doctrine is rooted in Article III of the

16   Constitution, which limits federal courts' subject matter jurisdiction to "cases" or "controversies."

17   U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). "The basic

18   question in determining mootness is whether there is a present controversy as to which effective

19   relief can be granted." *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing

20   *United States v. Geophysical Corp. of Alaska*, 732 F.2d 693, 698 (9th Cir. 1984)). "A case becomes

21   moot whenever it los[es] its character as a present, live controversy of the kind that must exist if

22   [courts] are to avoid advisory opinions on abstract propositions of law." *West v. Sec'y of Dep't of*

23

---

[4] As federal civil detainees, Petitioners are protected by the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

REPORT AND RECOMMENDATION - 14

1    *Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)); *see*

2    *also Rosemere*, 581 F.3d at 1172-73 ("A claim is moot if it has lost its character as a present, live

3    controversy.") (quoting *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir.

4    1997)).

5         Respondents argue that because ICE has released Ms. Dawson, Mr. Espinoza-Esparza, Mr.

6    Plutin Hernandez, Ms. Gonzalez Mendoza, and Ms. Ramirez-Ochoa, their claims are moot. (Mot.

7    at 17-18.) Respondents assert that because Petitioners only challenge their detention, there is no

8    collateral consequence that may be addressed by the Court. (*Id.* (citing *Abdala v. INS*, 488 F.3d

9    1061, 1065 (9th Cir. 2007) (removal or release renders habeas petition moot unless there is a

10   "collateral consequence" that may be redressed by success on the petition)).) Petitioners respond

11   that they continue to have a personal stake in the outcome of this case because Respondents have

12   not disavowed their authority to re-detain them at the NWIPC during the pandemic. (Resp. at 21

13   n.17 (citing *Clark v. Martinez*, 543 U.S. 371, 376 n.3 (2005) (release on 1-year parole subject to

14   DHS's discretionary authority to terminate did not moot habeas action that argued DHS did not

15   have authority to continue detention).) Respondents do not address Petitioners' arguments in their

16   reply brief.

17        There is no evidence Respondents have disavowed the possibility of re-detaining Ms.

18   Dawson, Mr. Espinoza-Esparza, Mr. Plutin Hernandez, Ms. Gonzalez Mendoza, and Ms. Ramirez-

19   Ochoa during the pandemic and under conditions materially similar to those that Petitioners

20   challenge in this lawsuit. While not expressly stated in their prayer for relief, it is clear that

21   Petitioners' habeas petition and complaint for injunctive relief seeks release "during the current

22   outbreak of COVID-19." (*See* Pet. at 3, 21.) Granting the release Petitioners request here could

23   provide them with greater relief than what Respondents have voluntarily provided. Accordingly,

the Court recommends denying Respondents' motion to dismiss these claims as moot. *See Clark*, 543 U.S. at 376 n.3 (habeas petition not moot where relief sought was different than relief voluntarily granted).[5]

B.      Right to Reasonably Safe Conditions

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).[6] The government thus violates the Due Process Clause if it fails to provide civil detainees with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. In the context of a "failure to protect" claim under the Due Process Clause, the Ninth Circuit analyzes government conduct under an objective deliberate indifference standard. *See Castro v. Cty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (adopting objective deliberate indifference standard based on *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015), to evaluate failure to protect claim brought by pretrial detainee). Under this standard, the defendant's conduct "must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (internal quotations omitted). To demonstrate objective deliberate indifference, a plaintiff must show:

(i) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(ii) Those conditions put the plaintiff at substantial risk of suffering serious harm;

---

[5] To the extent the released Petitioners have already been awarded the relief they seek in this lawsuit, Respondents have not shown that the voluntary cessation exception to the mootness doctrine does not apply. *See Rosemere*, 581 F.3d at 1173 ("The party alleging mootness bears a 'heavy burden' in seeking dismissal" and "must show that it is 'absolutely clear' that the allegedly wrongful behavior will not recur if the lawsuit is dismissed.") (quoted source omitted).

[6] In *DeShaney*, the Supreme Court analyzed the petitioners' rights under the Fourteenth Amendment. *See DeShaney*, 489 U.S. at 194-95. Fifth Amendment due process claims and Fourteenth Amendment due process claims are analyzed in the same way. *See Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

(iii) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(iv) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.*

Respondents argue that Petitioners cannot establish deliberate indifference given the substantial preventative measures Respondents have taken, which have evolved as more information about COVID-19 has become available. (*See* Mot. at 23-25.) Petitioners respond that they face a substantial risk of serious harm if they remain at the NWIPC and that Respondents have failed to take reasonable measures to abate the risk. (Resp. at 18.) Petitioners cite the positive COVID-19 tests for newly-arrived detainees and fault Respondents for failing to test a substantial number of detainees or staff. (*Id.* at 19-20.) Petitioners also allege that Respondents inadequately screen staff and detainees for asymptomatic infection, have not provided facilities that allow for adequate social distancing and proper hygiene, and have failed to enact any specific protections for medically vulnerable detainees. (*Id.* at 19-20.) Petitioners also cite to *Pimentel-Estrada v. Barr*, --- F. Supp. 3d ----, 2020 WL 2092430 (W.D. Wash. Apr. 28, 2020) (Martinez, C.J.), which evaluated the conditions at the NWIPC and found, based on the particular circumstances of the petitioner, that relief was warranted. The court identified several "glaring deficiencies" in the government's efforts to protect high-risk detainees from serious harm, *id.* at *11 - *16, and Petitioners claim that the same "glaring deficiencies" remain unaddressed by Respondents. (Resp. at 18-19.) Respondents contend, however, that they have addressed certain of these deficiencies by performing additional testing and further reducing and rearranging the detainee population to allow for meaningful social distancing. (Mot. at 23-24; Reply at 7.)

REPORT AND RECOMMENDATION - 17

Having considered the particular facts and circumstances of this case, *see Castro*, 833 F.3d at 1071, the Court finds that Petitioners have not shown Respondents are detaining them under conditions that violate their Fifth Amendment right to reasonable safety. In late May and early June 2020, Respondents tested approximately 80% of the detainee population, and the only detainee who tested positive was a recent transfer who was still in quarantine in the New Intake Monitoring Unit. Since then, the only positive test results have occurred in newly-arrived detainees, and ICE has been able to successfully isolate and treat these individuals. As of August 13, 2020, ICE had administered more than 745 COVID-19 tests to NWIPC detainees, and no detainee in the general population or NWIPC staff member has tested positive for the virus.

In addition to increased testing, Respondents have taken substantial measures to prevent an outbreak of COVID-19 at the NWIPC and to contain an outbreak should one occur. As detailed above, these measures include but are not limited to screening, voluntary COVID-19 testing, and quarantining of incoming detainees; reducing and distributing detainee population to allow for more effective social distancing; offering alternative housing options to high-risk detainees; providing masks to detainees for use on a voluntary basis; increased use of PPE by staff when interacting with detainees and a commitment by GEO to begin requiring masks for staff who come into close contact with detainees; minimizing comingling between housing units; enhancing cleaning and making supplies available to detainees in the general population to clean high-use areas before their personal use; limiting visitors and requiring them to wear PPE; and temperature checks for incoming employees. Respondents' efforts have only grown more rigorous since this case was filed.

Considering the results of the comprehensive testing in late May and early June 2020 and Respondents' continued testing, Respondents' sustained success in identifying and isolating

REPORT AND RECOMMENDATION - 18

COVID-19 in newly-arrived detainees and preventing its spread to the general population, and the substantial measures Respondents have implemented to prevent and contain the virus' spread, "the court cannot reasonably find that an outbreak of COVID-19 at the [NWIPC] is likely to occur." *Castaneda Juarez v. Asher*, No. 20-700-JLR-MLP, 2020 WL 3163208, at *7 (W.D. Wash. June 12, 2020). Given this record, the Court cannot conclude that the current conditions at the NWIPC "place Petitioners at risk of substantial harm or that Respondents' efforts fail to reasonably abate the risk of infection for vulnerable detainees." *Id.* Accordingly, the Court recommends granting Respondents' motion to dismiss Petitioners' Fifth Amendment "reasonable safety" claim.

C.      Conditions Amounting to Punishment

       To evaluate the constitutionality of a pretrial detention condition under the Fifth Amendment, a district court must determine whether those conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley*, 135 S. Ct. at 2473-74 (2015). Punishment may be shown through an express intent to punish or a restriction or condition that "is not reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 539; *see also Kingsley*, 135 S. Ct. at 2473-74 (clarifying that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose").  Petitioners raise only the second test, arguing that the risk they face of serious illness or death from COVID-19 exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to or is excessive in relation to a legitimate governmental interest. (Resp. at 21.)

       As Respondents argue, the Supreme Court has recognized a legitimate government interest in ensuring that noncitizens appear for their removal or deportation proceedings and protecting the community from harm. *See Jennings v. Rodriguez*, --- U.S. ---, 138 S. Ct. 830, 836 (2018); *Demore*

*v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas*, 533 U.S. at 690-91. Although Petitioners argue that the imminent danger posed by COVID-19 outweighs any government interest in effectuating removal and protecting the community (Resp. at 21), the Court cannot conclude that the risk of COVID-19 at the NWIPC is "imminent." Indeed, Respondents' substantial steps to abate the risk of COVID-19 and the results from the comprehensive testing and continued testing, indicate that Respondents' measures have thus far been effective at preventing a COVID-19 outbreak and containing the virus' spread. Based on this record, the Court cannot conclude that Petitioners face imminent danger that outweighs the government's interests here. *See Castaneda Juarez*, 2020 WL 3163208, at *7. Accordingly, the Court recommends granting Respondents' motion to dismiss Petitioners' Fifth Amendment due process claim that their continued detention amounts to punishment.

## IV.    CONCLUSION

The Court recommends that Respondents' motion to dismiss (Dkt. 94) be GRANTED, Petitioners' habeas petition and complaint for injunctive relief (Dkt. 1) be DENIED, and this action be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be

/ / /

REPORT AND RECOMMENDATION - 20

1    ready for consideration by the District Judge on **<u>September 4, 2020</u>**.

2         Dated this <u>17th</u> day of August, 2020.

3

4                                             _____
                                             Mary Alice Theiler
5                                             United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23